FILED
2024 Jul-09  PM 02:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| CANDICE WADE, ET AL., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NUMBER: |
| ) | |
| COLBERT ANIMAL SERVICES, ) | |
| COLBERT COUNTY, CITY OF TUSC- ) | |
| UMBIA, CITY OF MUSCLE SHOALS, ) | |
| CITY OF SHEFFIELD, STEVEN ) | |
| HIGGINBOTHAM, WILLIAM MUR- ) | |
| NER, YOLONDA JONES, CHARLES ) | |
| COREY SPEEGLE, AND JESSICA ) | |
| HOGAN, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Comes now the plaintiff, Candice Wade, initiating this legal action seeking monetary damages on her behalf and class injunctive relief. This action is brought forth primarily to safeguard rights guaranteed under 42 U.S.C. §1983, which offers redress for violating rights, privileges, or immunities protected by the United States Constitution.

## I.      JURISDICTION AND VENUE

1.      The authority of this Court is invoked for Counts I - VI pursuant to 28 U.S.C. § 1331, because each is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and each alleges violations of the United States Constitution. The supplemental authority of this Court is invoked under 28 U.S.C. § 1367(a) for Counts VII - XIV

1

asserting pendent state-law claims.

2.     Venue is proper in this division and district under 12 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this division and district. Venue is proper in this division and district under 28 U.S.C. § 1391(b)(1) and (c)(2) because the defendants reside in this district and division.

## II.    <u>**PARTIES**</u>

3.     The plaintiff, Candice Wade, a 47-year-old white female, is a resident and citizen of Tuscumbia, Colbert County, Alabama.

4.     Defendant Colbert Animal Services is a nonprofit entity, located and operating within this district in Colbert County, Alabama.

5.     Defendant Colbert County is located within this district.

6.     Defendant City of Tuscumbia ("Tuscumbia") is an incorporated municipality within Colbert County Alabama, and this district.

7.     Defendant City of Muscle Shoals ("Sheffield") is an incorporated municipality within Colbert County Alabama, and this district.

8.     Defendant City of Sheffield ("Sheffield") is an incorporated municipality within Colbert County Alabama and this district.

9.     The defendant, Steven Higginbotham, a 55-year-old white male, is sued in his individual capacity only. He is a resident and citizen of Colbert County,

Alabama.

10.     The defendant, William Murner, a 43-year-old white male, is sued in his individual capacity only. He is a resident and citizen of Colbert County, Alabama.

11.     The defendant, Yolanda Jones, is over the age of 19, an African-American female, and sued in her individual capacity only. She is a resident and citizen of Colbert County, Alabama.

12.     The defendant, Corey Speegle, a 47-year-old white male, is sued in his individual capacity only. He is a resident and citizen of Colbert County, Alabama.

13.     The defendant, Jessica Hogan, a 38-year-old white female, is sued in her individual capacity only. She is a resident and citizen of Colbert County, Alabama.

## III.    <u>STATEMENT OF FACTS</u>

14.     Under Ala. Cod. § 3-7A-7 (1975), at all relevant times, Colbert County, and the cities within its borders with populations over 5,000, were legally required to provide a pound and impound officer for the impoundment of animals at large. Alternatively, those cities could pay their *pro rata* share of the cost.

15.     Alabama Code § 36-21-40 (1975) defines a "law enforcement officer" as "[a] policeman, deputy sheriff, deputy constable and <u>other official who has authority as such official to make arrests</u>. (emphasis added).

3

16.     Alabama Code § 36-21-46(a) (1975), states in part that "[n]o city, town, county, sheriff, constable, or other employer shall employ any [law enforcement officer] applicant unless the person submits to the appointing authority an application for employment verified by affidavit of the applicant and showing compliance with the following: . . . the applicant [has] complet[ed] the required course of training established by the [Alabama Peace Officers Standards & Training Commission ("APOSTC")]." (emphasis added).

17.     Under Ala. Code § 3-1-16 (1975), the county commissions of each county may employ suitable persons with full police powers who are charged specifically with the duty of enforcing all laws for the prevention of cruelty to animals. (emphasis added)

18.     When read together, §§ 36-21-40, 36-21-46, and 3-1-16 require that any person employed by a county commission possessing full police powers and "charged specifically with the duty of enforcing all laws for the prevention of cruelty to animals," must meet the certification requirements of the APOSTC.

19.     Law enforcement by issuance of a Uniform Non-traffic Citation and Complaint ("UNTCC") is a public function, the exclusive prerogative of the state and its delegates, not granted to private citizens.

20.     The issuance of a UNTCC is a seizure where the recipient is not released from issuer's custody until he or she has signed a promise to later appear

in court.

21.    Thereafter, a failure to appear may result in a charge of second-degree

bail jumping. *See, e.g.*, UNTCC excerpt,

| COURT APPEARANCE INFORMATION | ☐ Court Appearance Required |
|---|---|

By signing this citation, I am promising to appear in court on the date and at the times specified below if a court appearance is not required, I may choose to plead guilty before a magistrate or by mail or in person, paying the required fine and court costs prior to my scheduled court date, in which event I do not have to appear in court.  If I do not appear in court on the scheduled date and if I do not plead guilty and pay the required fine and costs prior to that.  I promise to pay an amount prescribed by law.

I also understand that failure to appear or to plead guilty and pay the fine and costs may result in a warrant being issued for my arrest on the present charge and I may also be charged with second degree bail jumping.

| Court Appearance Date (if applicable ) | | | | | Court Address | Telephone Number |
|---|---|---|---|---|---|---|
| Month | Day | Year | Time | ☐ AM ☐ PM | | |
| Defendant's Signature | | | : | | | Telephone Number |

NOTICE: FAILURE TO APPEAR IN COURT AND/OR FAILURE TO REMIT FINE AND COSTS WILL RESULT IN AN ARREST WARRANT BEING ISSUED

| 1. White – Court | 2. Pink – Law Enforcement | 3. Canary – Defendant |
|---|---|---|

22.    Sometime prior to 2022, Colbert County either contractually or by vote

of its commissioners, engaged the animal control services of the private entity,

Colbert County Animal Control Association ("CACA").

23.    Sometime prior to 2022, Tuscumbia, Sheffield, and Muscle Shoals

either contractually or by vote of its commissioners, engaged the services of CACA.

24.    On or around January 27, 2022, CACA changed its name to Colbert

Animal Services ("CAS").

25.    CAS is a nonprofit who's stated purpose is to "contract with Colbert

County for control of animals/operate pound." *See* Excerpt from SOS Website,

5/16/24, 3:01 PM                                              Business Entity Records | Alabama Secretary of State

 **Alabama Secretary of State**                                    SOS Office    Elections    Services

| Colbert Animal Services | |
|---|---|
| Entity ID Number | 000-075-821 |
| Entity Type | Domestic Non-Profit Corporation |
| Principal Address | Not Provided |
| Principal Mailing Address | Not Provided |
| Status | Exists |
| Place of Formation | Colbert County |
| Formation Date | 09/14/1993 |
| Registered Agent Name | ASHE, LAUGHLIN |
| Registered Office Street Address | MUNICIPAL BUILDING SHEFFIELD, AL |
| Registered Office Mailing Address | MUNICIPAL BUILDING SHEFFIELD, AL |
| Nature of Business | CONTRACT WITH COLBERT CO FOR CONTROL OF ANIMALS/OPERATE POUND |
| Capital Authorized | |
| Capital Paid In | |

26.     The named change occurred as part of a joint venture between Colbert

County, Tuscumbia, Muscle Shoals and Sheffield. *See*, *e.g.*, Facebook Post,



 **Colbert County Animal Shelter**
June 3, 2022 · 🌐                                                      · · ·

**City of Sheffield, Alabama - Government**
June 3, 2022 · 🌐

Colbert Animal Services was formed as a joint venture of Colbert County
and the cities of Muscle Shoals, Sheffield and Tuscumbia. With the support
of the local governments, the new Director is enforcing our animal control
ordinances in a more thorough manner than in the past. Animal Control is
working in Sheffield today to identify violations including illegal tethering
and dogs running loose. They are issuing warnings initially so the public is
aware that the ordinances are going to be enforced more consistently than
previous practice. Repeat violations will result in a citation being issued. In
the future, citations will be issued whenever violations occur. The purpose
of the animal control ordinances is to protect people and property from
injury or damage from animals and to protect the animals from abuse and
harm. Your cooperation and understanding in this effort is greatly
appreciated.

👍❤️ 135                                        39 comments   39 shares

27.    Colbert County, Tuscumbia, Muscle Shoals, and Sheffield contractually or by vote of its commissioners, engaged or continued to engage the services of CAS.

28.    CAS is operated by a Board of Directors with day-to-day management vested in a Director of Animal Shelter, which the board supervises.

29.    Because CAS is a joint venture between Colbert County, Tuscumbia, Sheffield and Muscle Shoals, each co-venturer has a representative sitting on CAS's Board of Directors.

30.    At all relevant times, CAS's Board of Directors consisted of the following:

        a.    One sitting Colbert County Commissioner serving as Chair,

        b.    The sitting Mayor of Tuscumbia,

        c.    The sitting Mayor of Sheffield,

        d.    The sitting Mayor of Muscle Shoals, and,

        e.    One Citizen at Large.

31.    Around 2011, CAS (formerly CACA) was on notice that a) its employees did not possess statutorily granted police powers and b) the Director of Animal Shelter and CAS's other employees were not legally authorized to issue the UNTCC for any violation of law.

32.    CAS gained that organizational knowledge when its animal control

7

officer, Anthony Wilbanks, working on his own for the first time, issued and then attempted to file completed UNTCC forms with the Tuscumbia Municipal Court. The citations did not reflect an Agency Originating Identifier ("Agency O.R.I").

33.     At no time relevant has CACA or CAS possessed an Agency O.R.I., which is required to complete the UNTCC. *See, e.g.*, UNTCC excerpt,

| Sworn to and acknowledged before me this date | Months | Day | Year | Complainant's (Officer's) Signature | | |
|---|---|---|---|---|---|---|
| Signature and Title of Judicial Officer | | | Officer I.D. | | | Agency O.R.I. |
| | | | | | AL | |

34.     The Clerk of Tuscumbia Municipal Court rejected the two UNTCCs and sent Anthony Wilbanks to the judge. The judge advised Wilbanks on the legal and proper procedure for a non-law enforcement officer to initiate complaints against pet owners for perceived violations of animal-related law.

35.     From then until sometime in 2022, CAS used the procedure outlined by the judge whereby if employees observed a pet owner's alleged violation of animal-related law, the following occurred:

a.     The employee would contact a law enforcement officer; the law enforcement officer would respond on the scene and determine whether probable cause for arrest exists; if so, the officer would issue the citation. If no law enforcement officer could respond,

i.     The CAS employee, normally the Director of Animal Shelter, would go before a magistrate judge with a complaint.

8

     ii.    The magistrate judge would examine the complainant, and any witnesses.

     iii.    If the magistrate judge was satisfied that the offense was committed, he or she would issue a summons for the pet owner to appear in court.

     iv.    If the pet owner did not appear in court, the magistrate judge would issue an arrest warrant.

36.    Charles Corey Speegle ("Speegle") operated and operates a K-9 search and rescue service. In its 2020-2021 budget, Colbert County apportioned $51,000 annually to pay Speegle for those services as a contractor. That money did not come out of the Colbert County Sheriff's budget; the Sheriff had his own Search and Rescue Unit (SAR). Instead, the $51,000 was a separate line-item expenditure.

37.    According to LinkedIn, Speegle also did and does operate the business, "Second Amendment AK47 and SKS Parts."

38.    Speagle volunteered as a Colbert County Reserve Deputy, sworn in sometime prior to 2022.

     a.    Under the law, reserve deputy sheriffs are volunteers that need not be APOTC certified and only allowed to serve in limited capacities while under the <u>direct</u> control and supervision of a lawful sheriff's department officer or certified law enforcement officer, or when supervised <u>indirectly</u> by a certified law enforcement officer while controlling traffic or crowds. *See* Ala. Code §§ 11-43-210 and 45-17-231.20 (2013).

39.    In early 2022, CAS hired Speegle instead of Anthony Wilbanks for the

Director of Animal Shelter position.

40.   Speegle and or CAS eliminated the procedure outlined in Paragraph 22, and implemented a new policy, practice or custom where CAS employees issued the form UNTCC directly to pet owners.

41.   At all relevant times, CAS employed Speegle full-time as its Director of Animal Shelter, and it compensated him as its employee, including offering or providing him employee benefits. *See* Job Description Excerpt,

**COLBERT ANIMAL SERVICES**

**DIRECTOR OF ANIMAL SHELTER**

SALARY RANGE $40,000 Annually plus benefits

(Benefits include vehicle, fuel, health insurance, cell phone...)

42.   Once in his new role with CAS, with the consent of its Board of Directors, *i.e.*, each co-venturer, Speegle started wearing a uniform that gave the appearance that he was law enforcement; carrying a badge; openly carrying a holstered handgun and handcuffs; and at times, donned a tactical vest or bullet proof vest with his badge affixed.

43.   Shortly after hiring Speegle, the Chair of CAS's Board of Directors, Tori Bailey (Colbert County Commissioner) ("Bailey"), and Colbert County Administrator Roger Creekmore ("Creekmore"), approached Frank Williamson (former Colbert County Sheriff) ("Williamson") and told him that they wanted Speegle sworn in again, but this time as a Colbert County Deputy Sheriff.

44.    Williamson declined because Speegle was not qualified for APOTC certification. Still, because Bailey and Creekmore could affect his budget, he told them he could have Speegle sworn in again as a Colbert County Reserve Deputy.

45.    Williamson has confirmed that Speegle was never sworn in as a Colbert County Deputy Sheriff.

a. Throughout 2023, Speegle continued to volunteer with the Colbert County Sheriff's Office ("CCSO") as a Reserve Deputy, receiving a year-end award for marksmanship. *See,* Excerpts from Facebook Post,



***



46.     Speegle started issuing UNTCCs sometime around the time when he was sworn in a second time as a Colbert County Deputy Sheriff.

47.     Bailey and Creekmore returned and told Williamson that they wanted him to provide Speegle with a Colbert County Sheriff's vehicle for his use while working for CAS. Williamson felt obliged and provided CAS/Speegle with a fully equipped patrol vehicle, including functional emergency lights.

48.     CAS or the sheriff removed from the vehicle the insignia of the Colbert County Sheriff and in its place fashioned a new insignia that represented the vehicle was operated by an animal law enforcement agency.

     a. CAS's other vehicles operated by animal control officers, regardless of purchaser, evidence similar insignia.

     b. In December 2022, several insignias on CAS's vehicles looked as follows:





    c. The vehicles do not exhibit any indication that they are not operated by law enforcement, nor that they are operated by a nonprofit entity.

    d. As of May 16, 2024, even CAS's Facebook page represented the nonprofit as a law enforcement agency. *See* Print Screen Excerpt,



49. Bailey and Creekmore returned again, and this time they told

Williamson that because of a lack of cell coverage in rural areas, they wanted Williamson to allow CAS to use the Colbert County Sheriff's radio frequency, which includes but in not limited to, the use of dispatch by Colbert County 9-1-1. Again, Williamson felt obliged, and he granted the request.

50.    As the number of UNTCCs that CAS issued increased, so did its hiring of additional animal control officers.

51.    After Speegle was hired, in less than two years the number of animal control officers employed by CAS increased fivefold.

52.    CAS and its government partners treated each of those animal control officers as if they were law enforcement officers. *See*, *e.g.*, Facebook Post,



53.    Each animal control officer, with the consent of CAS's Board of Directors, wore uniforms that gave the appearance of law enforcement; carried a badge; openly carried holstered handguns and handcuffs; and at times, donned a tactical vest with a badged affixed.

54.    Around or before spring of 2023, District Attorney Hal Hughston (former Colbert County Attorney) ("Hughston") was on notice that CAS Animal

Control Officers, including Speegle, were not authorized to issue the UNTCCs he and his office were prosecuting.

55.    Still, Hughston and certain assistant district attorneys continued to prosecute criminal cases that they knew were improperly initiated using CAS issued UNTCCs.

56.    Williamson left office in or around January or February 2023.

57.    At all relevant times, CAS employed Jessica Hogan ("Hogan") full-time, and in the summer of 2023, she operated under the title, Animal Control Officer (Officer ID: AC2); she reported to Speegle.

58.    At all relevant times, Plaintiff Candice Wade ("Wade") lived in or near the jurisdictional limits of Tuscumbia, Alabama.

59.    The yard of Wade's residence was not fenced.

60.    At no time relevant did Wade own a dog, possess a dog, or take responsibility for the care of a dog.

61.    Sometime in 2023, a stray female dog started visiting the homes in Wade's neighborhood, and they would feed the dog from time to time when it visited.

62.    At some point before or during that time, the dog became pregnant and later gave birth to a litter of puppies.

63.    The neighborhood continued to feed the dog, and later, the dog with

her puppies in tow.

64.     During the two to three-week period preceding August 4, 2023, or thereabouts, Wade was out of state.

65.     Wade returned on or around August 4, 2023.

66.     When Wade returned, she observed the puppies and they appeared healthy, but between the day of her return and August 8, 2023, she observed one of them acting lethargic; it died sometime after that and later a second puppy acted the same and passed.

67.     Wade would have liked to take the puppies to a veterinarian, but she could not afford to do so. But she still wanted to help.

68.     Wade and or her neighbors provided the puppies with comfort, water and Pedialyte, a 6-1 vaccination from Rural King administered by a neighbor administered, and a dewormer.

69.     When there was no change in their condition, a neighbor discussed taking the puppies to a veterinarian and paying for their care.

70.     On August 8, 2023, Wade's neighbor took the surviving puppies to a veterinarian.

71.     Later that day, Speegle and Hogan arrived at Wade's home, entered upon her property, and inquired about the puppies and their mother.

72.     At all times relevant during the encounter, neither the puppies nor their

16

mother were on the premises of Wade's residence.

73.     Wade explained to Speegle and Hogan that she did not own the dogs, the puppies appeared sick, that she and the neighbors attempted to help them, and that a neighbor had taken them to the veterinarian.

74.     At Speegle's direction, Hogan completed two UNTCCs charging Wade with the violations of Ala. Code § 13A-11-241 (1975) and Ala. Code § 3-7A-2 (1975). One concerned "cruelty to dog or cat" and stated as its basis Wade's failure to promptly take the puppies to a veterinarian. The other was never discussed before its presentment to Wade, and it involved an allegation that Wade failed to have the puppies' mother vaccinated for rabies.

75.     Neither Hogan nor Speegle issued UNTCCs to any of Wade's neighbors, including the neighbor down the road that had the mother of the puppies in her fenced back yard.

76.     Hogan and Speegle lacked arguable probable cause to take Wade into custody.

   a.   Violations of Ala. Code § 13A-11-241 (1975) and Ala. Code § 3-7A-2 (1975) are considered "victimless" and they are not public offenses.

   b.   Neither violation alleged in the UNTCCs occurred in the presence of Speegle or Hogan.

   c.   The state's statute and related caselaw addressing cruelty to a dog or cat does not contain an expressed requirement that owners obtain or provide veterinary medical care.

    d.   The county's licensed rabies officer or licensed deputy rabies officers are the only individuals that may enforce the rabies control law by citation, and only the rabies officer may cancel a properly issued citation. Dr. Richard Youngblood is Colbert County's Rabies Officer.

    e.   Under § 3 of the Code of Alabama, a person failing to immunize for rabies is subject to a penalty imposed by the rabies officer not to exceed an amount equal to twice the state approved charge for immunization; all other violations of § 3 constitute a Class C misdemeanor.

77.    Speegle took the UNTCCs from Hogan and presented them to Wade, one on top of the other.

78.    Speegle told Wade if she signed the UNTCC charging her with animal cruelty, she would be released from custody and not taken to jail. Speegle signed the first UNTCC.

79.    Then Speegle revealed the second UNTCC that the first concealed.

80.    Wade refused to sign the second UNTCC and Speegle threatened her again with jail. Wade refused again and Speegle became visibly agitated and hostile.

81.    Two Tuscumbia police officers arrived on the scene, Captain Steven Higginbotham ("Higginbotham") and Investigator William Murner ("Murner"), a.k.a., Danley Murner. They encouraged Wade to sign the UNTCC to avoid jail.

82.    When Wade refused Speegle again, he told Higginbotham and Murner to "take her ass to jail, I'm tired of fooling with her."

83.    Higginbotham and Murner performed no independent investigation, they were experienced law enforcement officers, and they knew Speegle did not

possess police powers.

84.     Higginbotham and Murner lacked arguable probable cause to seize Wade.

85.     Still, under the city' policy, practice, or custom, and the policy, practice or custom of the city's police department, Higginbotham and Murner seized Wade and placed her in their vehicle as Speegle directed.

86.     They then transported Wade to the Colbert County Jail where they met Speegle.

87.     The booking officer at the jail, Yolanda Jones ("Jones") asked the name of the arresting officer. Speegle stated, "I am", and Higginbotham and Murner confirmed.

88.     Higginbotham and Murner then left the jail and Wade in Speegle's custody.

89.     Jones advised Speegle that the jail did not have a code under which to book Wade that corresponds with a charge of failure to vaccinate for rabies.

90.     Despite this knowledge, and her knowledge that Speegle was not a law enforcement officer with police powers, Jones did not intervene to stop Wade's imprisonment.

91.     After Wade was jailed, her mugshot was posted publicly, causing her extreme embarrassment and emotional distress. These mugshot postings

demonstrate the jail lacked a code that corresponded with the charge in the UNTCC.

*See* Excerpts 1 and 2 with no criminal charge where normally noted,



Excerpt 1.



***

bustednewspaper.com

### Booking Details

| name | CANDACE WADE |
|------|--------------|
| age | 45 years old |
| race | W |
| sex | Female |
| booked | 2023-08-08 |

### Charges

| charge description | CHARGE NOT LISTED |
|--------------------|-------------------|
| jurisdiction | |
| bond details | |
| bond amount | |

Excerpt 2.

92.     Speegle completed the booking interview, and he signed the jail's log identifying Wade as the arrestee and the Colbert County Sheriff's Office as the arresting agency.

93.     Wade was released later after she paid an appearance bond.

94.     The next day, Chief Deputy Lee Smith ("Smith") checked the log and observed that Speegle had represented the Colbert County Sheriff's Office was Wade's arresting agency.

95.     Smith has admitted that he changed the log to reflect that the Tuscumbia Police Department was the arresting agency for Wade.

96.     He did this because he knew Speegle did not possess police powers or the authority to have Wade jailed.

97.     Speegle and or Hogan routinely filed UNTCCs with the municipal

court of the city where they issued the same, but for Wade the UNTCCs were filed with the Colbert County District Court because they knew the Municipal Court of Tuscumbia had not accepted them in the past.

98. A UNTCC may serve as the charging instrument when properly verified and the law enforcement officer chooses to cite and release the defendant for a misdemeanor or violation listed in a Schedule of Fines adopted by each court pursuant to Rule 20 of the Alabama Rules of Judicial Administration.

   a. Animal-related violations, including failure to immunize for rabies, are not identified or listed within the Schedule of Fines adopted by each court in Colbert County.

   b. A failure to immunize for rabies does not constitute a misdemeanor or felony.

99. September 18, 2023, based on her pleas of not guilty to the charges levied by Hogan and Speegle, District Court Judge M. Chad Smith set Wade's criminal trial for December 4, 2023.

100. After Wade obtained criminal defense counsel, and that counsel moved to file a pretrial motion seeking dismissal, Hughston voluntarily moved Judge Smith for an Order to *Nolle Prosequi* the cases against Wade — dismiss those cases. Judge Smith granted Hughton's motion on December 8, 2023.

101. At all relevant times, Speegle, Hogan, and the other CAS Animal Control Officers failed to satisfy the APOSTC training requirements for certification.

102.    In fact, to work as a CAS Animal Control Officer applicants need only

pass a background check and drug test. *See*, *e.g.*, Facebook Post,



103.    Colbert County had and has an official policy, practice, or custom

enacted or acquiesced to, or ratified, by its commission and county administrator,

which outsourced to CAS the operation of a pound and employment of animal

control officers to enforce laws by issuing UNTCCs.

104.    As part of that policy, practice or custom, Colbert County engaged in

the following:

        a.    The county entered an agreement or contract with
              CAS for its operation of a pound and its
              enforcement of animal-related laws.

b.    The county placed Tori Bailey on CAS's Board of Directors where she serves as Chair.

c.    The county paid CAS for operating a pound and animal- related law enforcement by UNTCC.

d.    The county authorized CAS's use of Colbert County E911 dispatch services.

e.    The county repeatedly collected, retained, and benefited from the fines and costs generated from CAS's issuance of UNTCCs.

105.   Under Colbert County's official policy, practice, or custom, Speegle, Hogan, and other CAS Animal Control Officers issued as many as twenty (20) UNTCCs a day within the county, they took custody of the recipients, released the recipients if they accepted and signed the UNTCCs, or jailed them if they refused.

106.   Like the cities of Muscle Shoals and Sheffield, Tuscumbia had and has an official policy, practice, or custom enacted or acquiesced to, or ratified, by its mayor, commissioners, and police chief that outsourced law enforcement by UNTCC to CAS.

107.   As part of those official policies, practices, or customs, Muscle Shoals, Sheffield, and Tuscumbia engaged in the following:

a.    Each city repeatedly paid CAS for its services using taxpayer funds.

b.    Tuscumbia directed residents via its website to call CAS's phone number for animal control. *See* Print Screen excerpt from Tuscumbia's website,

| Public Safety | | |
|---|---|---|
| Animal Control | | 256-381-4073 |
| Fire Chief | David Pate (mailto:chiefpate71@gmail.com) | 256-383-5757 |
| Municipal Court | JoAnn Crouch (mailto:joanncrouch@cityoftuscumbia.org) | 256-386-5665 |
| Police Chief | Tony Logan (mailto:tlogan@tuscumbiapd.org) | 256-383-3121 |

c.     Each city's mayor served on CAS's Board of Directors so their respective municipalities could control CAS's operations.

d.     Tuscumbia updated its animal control ordinances at the direction of CAS. *See*, *e.g,* Facebook Post,

 **Charles Corey Speegle**

Last year I went to the Tuscumbia,AL City of Tuscumbia, Alabama - Government and asked them to amend the city ordinances on animals and tethering. I am happy to announce they have revised and passed the new ordinance dealing with tethering a dog within the city limits. Please read the new/revised ordinances (SEC 3-25 b).
I want to thank the Mayor and City council for doing this and looking out for the best interest of the animals. Also all permitting will be done by Colbert County Animal Shelter now.  The new ordinances were adopted August 21st and passed. I will be giving a 30 day grace period to give people a chance to be in compliance with the updated ordinances. In that period you will be given verbal or written warnings. After October 17th we will no longer be giving warnings and citations and summons will be issued to appear in Tuscumbia Municipal Court.

Director
Colbert Animal Services
Humane Law Enforcement

e.     Each city directed CAS to enforce all city codes and ordinances, not just that animal related.

f.     Each city directed its police department to treat Speegle and other CAS Animal Control Officers as law enforcement officers.

g.  Each city directed its police department field CAS telephone calls after hours.

h.  Each city directed that its police engage in joint tasks with CAS.

i.  Each city directed that its police seize and transport people that CAS seized.

108.  Under each city's official policy, practice or custom, Speegle, Hogan, and other CAS Animal Control Officers illegally issued more than fifty (50) UNTCCs within their respective jurisdiction limits, seizing the recipients.

109.  Upon replacing Williamson as the Sheriff of Colbert County, Erick Ballentine ("Balentine") quickly learned of CAS's operation and activities.

110.  Ballentine knowingly and formally adopted Williamson's previous directives, and implemented his own in writing, which required or allowed the following:

a.  The outsourcing of animal-related law enforcement within the county to a private entity.

b.  The continued service of Speegle as a Colbert County Reserve Deputy.

c.  The treatment of CAS Animal Control Officers as law enforcement officers possessing full police powers.

d.  CAS and its animal control officers' use of public equipment purchased by the Sheriff.

e.    CAS's daily use of the Colbert County Sheriff's radio frequency, as well as its use of the county's E911 dispatch services as an emergency responder.

f.    The dispatch of CAS Animal Control Officers to non-animal related complaints or disturbances, *e.g.*, assaults, burglaries/break-ins, and the like.

g.    The routine issuance by CAS Animal Control Officers of UNTCCs.

h.    The routine seizure of people in the county by CAS Animal Control Officers.

i.    CAS Animal Control Officer's routine use of the Colbert County Sheriff's Agency O.R.I.

j.    The imprisonment in Colbert County's Jail of those seized by CAS Animal Control Officers.

111.   Under Colbert County's and the Colbert County Sheriff's policies, practices or customs, Speegle, Hogan, and other CAS Animal Control Officers issued more than one hundred and fifty (150) UNTCCs within the boundaries of Colbert County.

112.   The operations of the Colbert County Sheriff and CAS are so intertwined that Ballentine has directed and knowingly allowed Speegle in his capacity as CAS's Director to apply for and give affidavits in support of search warrants, sign and execute those warrants, and arrest suspects based on those warrants.

IV.   **CAUSES OF ACTION**

A.   **COUNT I: RULE 23(B)(2) CLASS INJUNCTIVE RELIEF (AGAINST CAS, COLBERT COUNTY, TUSCUMBIA, SHEFFIELD, AND MUSCLE SHOALS)**

113.   Plaintiff Wade brings this cause of action, Count I, against Defendants Colbert Animal Services, Colbert County, Tuscumbia, Sheffield, and Muscle Shoals, through 42 U.S.C. §§ 1983 and 1988, on behalf of herself and all persons issued a UNTCC by a CAS employee.

114.   Wade seeks class injunctive relief under Fed. R. Civ. P. 23(b)(2) for violations of her and putative class members' well-established Fourth Amendment right under the U.S. Constitution to be free from unreasonable seizures.

115.   A private entity is subject to liability under § 1983 when it performs a function traditionally within the prerogative of the state or its delegates, thereby becoming its functional equivalent.

116.   Wade incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-2, 4-8, 14-35, 39-53, 81-88, 97-98, 101-108, *supra*.

117.   The enforcement of laws and ordinances by UNTCC is a function exclusive to the state and its delegates.

118.   Under Ala. R. Jud. P Rule 20(I) and (J), only law enforcement officers or officers of a state agency responsible for enforcing the rules and regulations of that agency may issue a UNTCC.

119.   Colbert County, Muscle Shoals, Sheffield, and Tuscumbia each had an

official policy, practice, or custom under which they used CAS to enforce laws and city ordinances by issuing UNTCCs, including but not limited to those for the prevention of animal cruelty, animal control and animal-related public health — rabies immunizations. Where applicable, they also used CAS to satisfy § 3-7A-7.

120.   The police departments of Tuscumbia, Sheffield, and Muscle Shoals, as well as the Sheriff's office, each had a policy or custom directing or permitting CAS Animal Control Officers to issue UNTCCs for perceived violations of ordinances and animal-related statutes.

121.   A seizure resulted or results each time a CAS Animal Control Officer issued or issues a UNTCC.

122.   As shown in this job description excerpt, CAS made Speegle responsible for the establishment of its policies, procedures, and standards, as well as the enforcement of animal control ordinances.

JOB SUMMARY:

This is an administrative position responsible for directing department operations directly or through a subordinate supervisor, supervising employees, establishing departmental policies and procedures, preparing and administering the department budget, responding to citizen complaints, performing public relations regarding animal issues, enforcing animal control ordinances, preparing all necessary documentation, maintaining appropriate records, and planning and evaluating the work performed. Abides by the Employee Operations Manual.  Ensures the Cities of Tuscumbia, Muscle Shoals, and Sheffield, and the County of Colbert are made aware of by Animal Control ordinances and state laws in the apprehension of stray, vicious, or unwanted animals.

***

4. Establishes animal shelter resources, policies, procedures, and standards; assists with complex problems/situations, and provides technical expertise; ensures departmental compliance with all applicable laws, rules, regulations, and standards.

123.   On behalf of CAS and with approval of its county and municipal partners on its board, Speegle implemented these policies, practices or customs establishing a private police force:

      a.     CAS Animal Control Officers were to operate within Colbert County as law enforcement officers.

      b.     CAS hired animal control officers not qualified to serve as certified law enforcement officers.

      c.     CAS Animal Control Officers were to issue UNTCCs and take custody of recipients for perceived violations of city ordinances, animal control, animal cruelty, and animal-related public health laws.

      d.     CAS obtained permission to utilize equipment and resources of the Colbert County Sheriff and did so afterward.

      e.     CAS obtained permission to utilize the Colbert County Sheriff's Agency O.R.I. when issuing UNTCCs and elsewhere and did so afterward.

      f.     CAS Animal Control Officers were to imprison individuals, like Wade, who refused to sign a UNTCC issued by CAS, and they did so with the Sheriff's knowledge and in his jail.

124.   Colbert County, the Colbert County Sheriff, Tuscumbia, Muscle Shoals, and Sheffield provided CAS with a mantle of authority that enhanced the power of CAS's animal control officers.

125.   Based on the preceding, ¶¶ 115-117, 119-120, 123-124, CAS Animal Control Officers engaged in law enforcement by UNTCC were performing a

function traditionally within the prerogative of the state or its delegates.

126.   CAS's law enforcement activities were accomplished in partnership with Colbert County, the Colbert County Sheriff, and each defendant's municipal police force and or CAS acted as each defendant's arm; thus, CAS Animal Control Officers were acting under color of law when they issued UNTCCs taking recipients into custody.

127.   CAS and its animal control officers acted pursuant to the official policies, practices, or customs of Defendants Colbert County, Muscle Shoals, Sheffield, and Tuscumbia, as well as its own policies approved by those defendants.

128.   And those policies, practices, or customs caused CAS and its animal control officers to illegally seize UNTCC recipients.

129.   The seizure of anyone issued a UNTCC by a CAS Animal Control Officer constituted, or constitutes, an unreasonable seizure violating their Fourth Amendment rights under the U.S. Constitution, and class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) to obtain prospective relief.

130.   Certification of the proposed class is superior to other means for the fair, efficient, and economical presentation of evidence, and adjudication of common questions of law and fact for Plaintiff, the proposed class and the defendants, because, (a) Wade's individual claim requires resolution of the common question: whether Defendants' official policies, practices or customs directed or

31

permitted CAS employees' law enforcement by UNTCC;  b) Wade's individual claim requires resolution of the common question: whether there is a causal connection between Defendants' official policies, practices, or customs and her unconstitutional seizure or arrest; (c) Wade's individual claim requires resolution of the common question: whether Defendants' policies, customs, or practices were the moving force behind her illegal seizure by CAS employees; (d) Wade's has standing to seek such relief in part because of the effect those policies, practices, or customs had on her and the putative class she seeks to represent, as well as her own interest in living in conditions free from the pernicious effects of those policies; and (e) the cost of proving (a) – (c) *supra* makes it impracticable for Wade and members of the proposed class to control the prosecution of their claims individually.

131.   Those common issues of fact and law affect the claims of Plaintiff and the proposed class and predominate over any issues affecting individual claims for injunctive relief.

132.   Wade was unlawfully seized or arrested under company-wide, city-wide, and county-wide policies, practices, and customs applicable to the class.

133.   Wade is a member of the class or sub-class she seeks to represent.

134.   Wade and members of the proposed class were directly affected by Defendants' policies, practices, and customs.

135.   The defendants have acted on grounds generally applicable to the class

by adopting and following systemic policies, practices, and customs causally connected to the violation of the Fourth Amendment rights of Wade and members of the putative class. These systemic policies, practices, and customs are Defendants' standard operating procedure rather than a sporadic occurrence.

136.    The class and or sub-class Wade seeks to represent exceeds 100 individuals and are too numerous to make joinder practicable.

137.    The claim of Wade and the relief to remedy her claim, are the same as the claims of the putative class and the relief necessary to remedy their claims.

138.    Wade seeks the following injunctive relief for her and the class: (1) a permanent injunction against CAS employees' issuance of UNTCCs; (2) a restructuring of the defendants' animal-related law enforcement; and (3) such other injunctive relief to redress the defendants' violation of their Fourth Amendment rights.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendants; (2) award Plaintiff injunctive relief, (3) award Plaintiff attorney's fees, expert witness fees, and court costs; and (4) award Plaintiff all other relief declared proper by the Court.

B.    COUNT II: VIOLATIONS OF U.S. CONST., AMEND. IV, THROUGH 42 U.S.C. §1983 (UNLAWFUL SEIZURE) (AGAINST CAS)

139.    Plaintiff Wade brings this cause of action, Count II, against Defendant CAS through 42 U.S.C. §§ 1983 and 1988, seeking money damages for violations

of her Fourth Amendment rights under the U.S. Constitution.

140.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-2, 4, 14-35, 38-87, 89, 91-112, 115, 121-126, *supra*.

141.   CAS acted as an arm of Tuscumbia's police department and or Tuscumbia police department was a participant in the issuance of UNTCCs by CAS Animal Control Officers, including Wade.

142.   CAS acted as an arm of the Colbert County Sheriff and or the Colbert County Sheriff was a participant in the issuance of UNTCCs by CAS Animal Control Officers, and their seizure of recipients like Wade.

143.   Speegle and Hogan were acting under color of law as defined by § 1983.

144.   Probable cause exists if a reasonable law enforcement officer could conclude that there is a substantial chance of criminal activity.

145.   Both Speegle and Hogan were acting in their capacities with CAS, not as private citizens, and they were not law enforcement officers.

146.   Even so, neither possessed arguable probable cause to seize Wade.

147.   CAS's official policies, practices, or customs caused Hogan and or Speegle to intentionally take Wade into custody, in violation of the Fourth Amendment to the U.S. Constitution.

148.   Speegle and Hogan acted pursuant to CAS's official policies, practices,

or customs, and those policies, practices, or customs caused Hogan's and or Speegle's illegal seizure and imprisonment of Wade, both in violation of the Fourth Amendment to the U.S. Constitution.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against CAS; (2) award Plaintiff compensatory damages for mental anguish, and to vindicate the violation of her valuable intangible constitutional rights; (4) award Plaintiff punitive damages, (5) award Plaintiff attorney's fees, expert witness fees, court costs, and interest as allowed by law; and (6) award Plaintiff all other relief declared proper by the Court.

### C. COUNT III: VIOLATIONS OF U.S. CONST., AMEND. IV, THROUGH 42 U.S.C. §1983 (UNLAWFUL SEIZURE) (AGAINST CITY OF TUSCUMBIA)

149.   This cause of action, Count III, is brought against Defendant Tuscumbia), through 42 U.S.C. §§ 1983 and 1988, seeking money damages for violations of the Fourth Amendment.

150.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-2, 6, 14, 19-21, 23-24, 26-30, 52-53, 76, 81-88, 91, 106-108, *supra*.

151.   Probable cause exists if a reasonable law enforcement officer could conclude that there is a substantial chance of criminal activity.

152.   Failure to vaccinate for rabies is not a criminal misdemeanor.

153.   Higginbotham and Murner knew Speegle served as a reserve deputy

sheriff, he was not a law enforcement officer with full police powers, and that neither Speegle nor Hogan were authorized to issue a UNTCC.

154.   Higginbotham and Murner lacked arguable probable cause to seize Wade.

155.   Still, Higginbotham and Murner unreasonably seized Wade pursuant to Tuscumbia's official policies, practices, or customs concerning CAS, and as directed by Speegle, they transported her to jail based on the same.

156.   As such, Tuscumbia's official policies, practices, or customs caused the unreasonable seizure of Wade in violation of her Fourth Amendment rights.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Tuscumbia; (2) award Plaintiff compensatory damages for mental anguish, and to vindicate the violation of her valuable intangible constitutional rights; (3) award Plaintiff attorney's fees, expert witness fees, court costs, and interest as allowed by law; and (5) award Plaintiff all other relief declared proper by the Court.

### D.   COUNT IV: VIOLATIONS OF U.S. CONST., AMEND. IV, THROUGH 42 U.S.C. §1983 (UNLAWFUL SEIZURE) (AGAINST HIGGINBOTHAM AND MURNER)

157.   This cause of action, Count IV, is brought against Defendants Higginbotham and Murner), in their individual capacities, through 42 U.S.C. §§ 1983 and 1988, seeking money damages for violations of the Fourth Amendment.

158.   Plaintiff incorporates by reference, as if fully stated below, the factual

allegations in Paragraphs 1-2, 9-10, 14, 19-21, 23-24, 26-30, 38, 45, 52-53, 76, 81-88, 91, 152-153, *supra*.

159.   Under the Constitution, a lawful warrantless arrest requires that an officer have probable cause.

160.   Probable cause exists if a reasonable officer could conclude that there is a substantial chance of criminal activity.

161.   On or about August 8, 2023, when Speegle engaged Wade in the presence of Higginbotham and Murner, and directed them to take Wade to jail, Defendant Higginbotham and Murner were working as law enforcement for Tuscumbia while acting under color of law within the meaning of 42 U.S.C. §1983.

162.   Higginbotham and Murner knew Speegle lacked full police powers as a Colbert County Reserve Deputy, and that he was not authorized to issue UNTCCs.

163.   Like all graduates of academies approved by the APOSTC, the basic training Higginbotham and Murner received to become certified police officers covered these legal issues:

    a.   Constitutional foundations.

    b.   Detention, arrest, use of force, search, and seizure law.

        1) The interpretation and applicability of these terms, statutes, and case decisions:

            i.   Color of Law
           ii.   18 U.S.C. §§ 241-242
         iii.   U.S. Constitution, Amendments IV, XIV-XV

      iv.  *Terry v. Ohio,* 392 U.S. 1 (1968)
      v.  *Tennessee v. Garner,* 471 U.S. 1 (1984)
      vi.  *Graham v. Conner*, 490 U.S. 386 (1989)

  c.  Civil and criminal liability law.

    1)  The interpretation and applicability of this statute:

      i.  42 U.S.C. §§1983 and 1985

164.  To graduate, Higginbotham and Murner had to score 70% or higher on his legal issues exam.

165.  Given the totality of the circumstances, Higginbotham and Murner did not have arguable probable cause justifying the restraint and transport of Wade to the Colbert County jail for imprisonment.

166.  Higginbotham and Murner knew or should have known they lacked probable cause to seize Wade, or they were plainly incompetent in doing so.

167.  It is clearly established law that when an officer arrests without arguable probable cause, he violates the Fourth Amendment rights of the arrestee to be free from unreasonable seizures.

168.  Based on the preceding, reasonable jurors could conclude that a) Higginbotham and Murner lacked arguable probable cause to restrain and transport Wade to jail; b) Higginbotham and Murner knew or reasonably should of have known that they were violating Wade's federally protected constitutional rights; and c) Higginbotham and Murner acted intentionally or they were plainly incompetent.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Higginbotham and Murner; (2) award Plaintiff compensatory damages for mental anguish, (3) award Plaintiff damages to vindicate the violation of her valuable intangible constitutional rights; (4) award Plaintiff punitive damages, (5) award Plaintiff attorney's fees, expert witness fees, court costs, and interest as allowed by law; and (6) award Plaintiff all other relief declared proper by the Court.

E.   **COUNT V: VIOLATIONS OF U.S. CONST., AMEND. IV, THROUGH 42 U.S.C. §1983 (FAILURE TO INTERVENE) (AGAINST HIGGINBOTHAM AND MURNER)**

169.   This cause of action, Count V, is brought against Defendants Higginbotham and Murner, in their individual capacities only, through 42 U.S.C. §§ 1983 and 1988, seeking money damages for violations of the Fourth Amendment.

170.   If a member of law enforcement fails or refuses to intervene when a constitutional violation takes place in his presence, that officer is personally liable.

171.   Plaintiff incorporates by reference, as if fully stated below, the factual allegations in Paragraphs 1-2, 9-10, 14, 19-21, 23-24, 26-30, 38, 45, 52-53, 76, 81-88, 91, 152-153, 161-164, *supra*.

172.   On or about August 8, 2023, when Speegle engaged Wade in their presence, Defendants Higginbotham and Murner were working as law enforcement for Tuscumbia while acting under color of law within the meaning of 42 U.S.C.

§1983.

173.   Higginbotham and Murner knew Speegle lacked full police powers as a Colbert County Reserve Deputy, and that he was not authorized to issue UNTCCs.

174.   Higginbotham and Murner knew or should have known that Speegle and or Jones (Booking Officer) violated Wade's constitutional rights when the two took Wade into custody and imprisoned her.

175.   Higginbotham and Murner knew or should have known of their affirmative duty to intervene to protect Wade's constitutional rights.

176.   Higginbotham and Murner observed and were able to intervene to stop the infringement of Wade's rights by Speegle and Jones, yet they failed to do so.

177.   Higginbotham and Murner were plainly incompetent when failing to intervene, or in the alternative, their failure to intervene demonstrates an intentional indifference and a callous disregard for Wade's constitutional rights.

178.   As a result of Defendants' failure to intervene, Wade has suffered violations of her constitutional rights; emotional distress; and monetary loss.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Higginbotham and Wade, in their individual capacities; (2) award Plaintiff compensatory damages for mental anguish, and to vindicate the violation of her valuable intangible constitutional rights; (3) award Plaintiff punitive damages, (4) award Plaintiff attorney's fees, expert witness fees, court costs, and interest as

allowed by law; and (5) award Plaintiff all other relief declared proper by the Court.

**F.   COUNT VI: VIOLATIONS OF U.S. CONST., AMEND. IV, THROUGH 42 U.S.C. §1983 (FAILURE TO INTERVENE) (AGAINST JONES)**

179.   This cause of action, Count VI, is brought against Defendant Yolanda Jones, in her individual capacity only, through 42 U.S.C. §§ 1983 and 1988, seeking money damages for violations of the Fourth Amendment.

180.   Plaintiff incorporates by reference, as if fully stated below, the factual allegations in Paragraphs 1-2, 11, 87, 89-96, *supra*.

181.   On or about August 8, 2023, Jones assisted Speegle and booked Wade into the Colbert County Jail.

182.   Jones knew Speegle lacked full police powers as a Colbert County Reserve Deputy or otherwise.

183.   Jones knew Speegle had charged Wade with a non-existent crime for she advised him that the jail did not have a code that corresponded with the charge, a failure to vaccinate for rabies.

184.   Jones knew or should have known Speegle's custody of Wade, his booking of Wade into the prison, and Wade's subsequent imprisonment each violated her Fourth Amendment right to be free from unlawful seizure.

185.   Jones knew or should have known of her affirmative duty to intervene to protect Wade's constitutional rights.

186.   Jones observed the infringement of Wade's constitutional rights, and

she could have intervened to stop that infringement, yet she did nothing.

187.   Jones was plainly incompetent when failing to intervene, or in the alternative, her failure to intervene demonstrates an intentional indifference and a callous disregard for Wade's constitutional rights.

188.   As a result of Defendant's failure to intervene, Wade has suffered violations of her constitutional rights; emotional distress; and monetary loss.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Jones, in her individual capacity; (2) award Plaintiff compensatory damages for mental anguish, and to vindicate the violation of her valuable intangible constitutional rights; (3) award Plaintiff punitive damages, (4) award Plaintiff attorney's fees, expert witness fees, court costs, and interest as allowed by law; and (5) award Plaintiff all other relief declared proper by the Court.

### G.   COUNT VII: NEGLIGENCE (AGAINST CAS)

189.   In addition, or in the alternative, Plaintiff brings this cause of action, Count VII, against CAS based on its negligence.

190.   A common law duty of care arises when the harm at issue is of a type reasonably foreseeable under the circumstances, and the imposition of such duty and liability comports with public policy under those circumstances.

191.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-3, 14-20, 28, 31-35, 39-49, 53, 57, 58-92, 101-102, 122-

123, *supra*.

192.   CAS charged Speegle with the responsibility of "enforcing animal control ordinances."

193.   CAS obtained blank UNTCC forms from local law enforcement agencies and distributed the same to its animal control officers.

194.   Given the circumstances—CAS reasonably foresaw that Speegle, Hogan, and or its animal control officers would enforce animal-related statutes and ordinances by UNTCC, and as a part of that enforcement, seize, arrest, imprison, and prosecute individuals, such as Wade.

195.   CAS had a duty to ensure that it and its employees were legally permitted to exercise those police powers on its behalf.

196.   The issuance of UNTCCs by Speegle, Hogan, and other Animal Control Officers was illegal, as was their custody, arrest, imprisonment, and prosecution of recipients of those UNTCCs, including Wade.

197.   Speegle and Hogan were acting within the scope of their employment with CAS and furthering the interests of CAS when they intentionally or through a lack of skill, arrested Wade; seized Wade; assaulted, and battered Wade; falsely imprisoned Wade; and maliciously prosecuted her.

198.   CAS breached its duty of care by failing to perform due diligence and make adequate inquiries as to the legality of its law enforcement activities.

199.   That breach proximately caused Wade's injuries, including monetary loss and damages associated with emotional pain and suffering.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendant CAS; (2) award Plaintiff compensatory damages; (3) award Plaintiff punitive damages; and (4) award Plaintiff all other relief declared proper by the Court.

### H.   COUNT VIII: NEGLIGENT HIRING AND SUPERVISION (AGAINST CAS)

200.   In addition, or in the alternative, Plaintiff brings this cause of action, Count VIII, against CAS based on its negligent hiring and supervision of Speegle and Hogan.

201.   A common law duty of care arises when the harm at issue is of a type reasonably foreseeable under the circumstances, and the imposition of such duty and liability comports with public policy under those circumstances.

202.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-3, 14-21, 28, 31-49, 53, 57, 58-92, 101-102, 122-123, *supra*.

203.   CAS charged its Director of Animal Shelter with the responsibility of "enforcing animal control ordinances."

204.   CAS hired Speegle and Hogan to serve as animal control officers; candidates not qualified to serve or be employed as a certified law enforcement

officer.

205.   Speegle was acting within the scope of his employment with CAS and furthering the interests of CAS when he unlawfully assaulted and battered Wade, and falsely imprisoned Wade.

206.   Hogan was acting within the scope of her employment with CAS and furthering the interests of CAS when she took custody of Wade and maliciously prosecuted Wade.

207.   Given the circumstances—CAS could reasonably foresee that Speegle, Hogan, and or its animal control officers would issue UNTCCs, physically touch or control, seize, arrest, or imprison individuals, and the potential for those animal control officers to do so unlawfully.

208.   CAS had a duty to ensure that its animal control officers, including Speegle and Hogan, did not unlawfully seize; arrest; assault, and batter; imprison; or maliciously prosecute individuals, and it breached that duty when it and its Board of Directors hired Speegle and then failed to adequately supervise and or train him and Hogan against unlawful seizures, false imprisonment, etc.

209.   The damages sustained by Wade resulted from the negligence and carelessness of CAS and its Board of Directors in hiring and or supervising CAS Animal Control Officers, specifically Speegle and Hogan.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment

against Defendant CAS; (2) award Plaintiff compensatory damages; (3) award Plaintiff punitive damages; and (4) award Plaintiff all other relief declared proper by the Court.

## I.   COUNT IX: NEGLIGENCE (AGAINST COLBERT COUNTY)

210.   In addition, or in the alternative, Plaintiff brings this cause of action, Count IX, against Defendant Colbert County based on negligence.

211.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-2, 5, 17-22, 24-49, 52-55, 57-92, 101-105, 111, *supra*.

212.   Alabama has granted county commissions the authority to hire persons that meet the APOSTC certification requirements as county employees charged with the enforcement of laws for the prevention of cruelty to animals.

213.   Colbert County's commissioners, its administrator, and county attorney are agents, officers, or employees of the county.

214.   Wade has suffered injuries, including monetary loss and damages associated with emotional pain and suffering.

215.   Wade's injuries were proximately caused by the neglect, carelessness, or unskillfulness of Colbert County's commissioners, administrator, and county attorney when a) improperly engaging CAS, a private entity, to enforce laws by UNTCC, including but not limited to, the prevention of animal cruelty, and b) supervising CAS's operations.

46

216.   The county's neglectful, careless, and or unskilled agents, officers, or employees at fault include, but are not limited to, County Commissioner Torri Baliey, Administrator Roger Creekmore, and former county attorney, Hal Hughston.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendant Colbert County; (2) award Plaintiff compensatory and punitive damages; (3) award Plaintiff all other relief declared proper by the Court.

### J.   COUNT X: NEGLIGENCE (AGAINST CITY OF TUSCUMBIA)

217.   In addition, or in the alternative, Plaintiff brings this cause of action, Count X, against Defendant Tuscumbia based on negligence.

218.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-2, 6, 23-24, 26-42, 48, 52-53, 57-88, 91, 98, 101-102, 106-108, *supra*.

219.   Tuscumbia implemented a policy that engaged the services of CAS to satisfy the requirements § 3-7A-7 (1975) and enforce city ordinances and laws pertaining to animal cruelty and animal-related public health laws.

220.   Municipal liability based on negligence exists where a) the municipality owed (or assumed) a duty to the plaintiff to use due care; b) an agent, officer, or employee of the municipality breached that duty through neglect, carelessness, or unskillfulness, c) the plaintiff was injured; and d) the municipal

employee's negligence, carelessness, or unskillfulness caused the injury.

221.   A common law duty of care arises when the harm at issue is of a type reasonably foreseeable under the circumstances, and the imposition of such duty and liability comports with public policy under those circumstances.

222.   Given the circumstances—Tuscumbia could reasonably foresee that animal control officers working for CAS would seize; arrest; physically touch or control; or imprison individuals such as Wade.

223.   By engaging CAS and establishing it for the purpose of ordinance and animal-related law enforcement, Tuscumbia assumed a duty to the plaintiff to ensure CAS and its employees would not and did not within its city limits, unlawfully seize; arrest; physically touch or control; or imprison individuals, including Wade.

224.   Tuscumbia's mayor, city council members, city attorney, police chief, and leaders within the police force, were agents, officers, or employees of the municipality.

225.   Wade suffered injuries proximately caused by the misfeasance of the mayor, city council members, and city attorney when outsourcing or continuing to outsource to CAS, responsibility for law enforcement.

226.   Wade suffered injuries proximately caused by the intervening misfeasance of the mayor, city council members, administrators, the police chief,

and leaders within the police force when they failed to adequately supervise CAS's enforcement of laws and prevent its actions described herein.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendant Colbert County; (2) award Plaintiff compensatory damages; (3) award Plaintiff all other relief declared proper by the Court.

### K.   COUNT XI: ASSAULT (AGAINST SPEEGLE)

227.   In addition, or in the alternative, Plaintiff brings this cause of action, Count XI, based on assault, against Defendant Speegle in his individual capacity.

228.   A claim of assault arises from an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to carry out the attempt.

229.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-2, 12, 58-82, *supra*.

230.   Hogan improperly issued Wade a UNTCC alleging Wade failed to vaccinate for rabies.

231.   Then, for her release from custody, Speegle demanded that Wade execute that UNTCC.

232.   Failure to vaccinate for rabies is not a criminal offense.

233.   While holding himself out as a law enforcement officer, in his capacity

as an animal control officer, Speegle threatened Wade with jail if she did not sign.

234.   When Wade refused to sign, Speegle continued to threaten her with jail, and from his tone and demeanor she could see Speegle was angry.

235.   Speegle's actions placed Wade in fear that Speegle would subject her to battery when taking her to jail, and his apparent authority as a law enforcement officer and physical attributes made her believe it would occur if he was not somehow stopped.

236.   Speegle's assault of Wade caused her to experience past and ongoing emotional pain, and suffering.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendant Speegle in his individual capacity; (2) award Plaintiff compensatory damages; (3) award Plaintiff punitive damages; and (4) award Plaintiff all other relief declared proper by the Court.

### COUNT XII: BATTERY (AGAINST SPEEGLE)

237.   In addition, or in the alternative, Plaintiff brings this cause of action, Count XII, based on assault, against Defendant Speegle in his individual capacity.

238.   A battery occurs when a defendant touched the plaintiff, the defendant intended to touch the plaintiff, and the touching was conducted in a harmful or offensive manner.

239.   Plaintiff incorporates by reference, as if fully stated here, the factual

allegations in Paragraphs 1-2, 12, 58-82, *supra*.

240.   After Speegle directed Higginbotham and Murner to "take her ass to jail," he intentionally laid his hands on Wade, physically took control of her, turned her body, and restrained her while handcuffs were placed on her wrists.

241.   Speegle's touching of Wade was unwanted and she found offensive his exercise of control over her body and restraint.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendant Speegle in his individual capacity; (2) award Plaintiff compensatory damages; (3) award Plaintiff punitive damages; and (4) award Plaintiff all other relief declared proper by the Court.

### L.   COUNT XIII: FALSE IMPRISONMENT (AGAINST SPEEGLE)

242.   In addition, or in the alternative, Plaintiff brings this cause of action, Count XIII, based on false imprisonment, against Defendant Speegle in his individual capacity.

243.   False imprisonment consists in the unlawful detention of the person of another for any length of time by which she is deprived of his personal liberty.

244.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-2, 12, 58-82, *supra*.

245.   Speegle unlawfully detained and imprisoned Wade.

246.   Speegle's false imprisonment of Wade caused her to experience past

and ongoing pain, and suffering, including past and ongoing emotional distress.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendant Speegle in his individual capacity; (2) award Plaintiff compensatory damages; (3) award Plaintiff punitive damages; and (4) award Plaintiff all other relief declared proper by the Court.

## M.   COUNT XIV: MALICIOUS PROSECUTION (AGAINST SPEEGLE AND HOGAN)

247.   In addition, or in the alternative, Plaintiff brings this cause of action, Count XIV, based on malicious prosecution, against Defendants Speegle and Hogan in their individual capacities.

248.   To maintain an action for malicious prosecution the plaintiff must show a prior judicial proceeding was instigated by the defendant without probable cause and with malice, such proceeding ending in favor of the plaintiff, but still causing the plaintiff damages.

249.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-2, 12, 58-82, 89, *supra*.

250.   Two criminal proceedings were initiated against Wade the UNTCCs Hogan issued at Speegle's direction as the charging instruments.

251.   Speegle and Hogan lacked probable cause to issue those UNTCCs.

252.   Speegle and Hogan knew they lacked probable cause.

253.   Speegle and Hogan issued those UNTCCs with malice as shown by

their knowledge of a lack of probable cause, Speegle's demeanor, their failure to issue citations to Wade's neighbors, and Speegle's use of jail as a punishment for her refusal to sign the baseless UNTCC.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendants Speegle and Hogan in their individual capacities; (2) award Plaintiff compensatory damages; (3) award Plaintiff punitive damages; and (4) award Plaintiff all other relief declared proper by the Court.

Respectfully submitted,


/s/ Robert J. Camp
Robert J. Camp
Counsel for the Plaintiff

OF COUNSEL:
**WIGGINS, CHILDS, PANTAZIS,
FISHER & GOLDFARB, L.L.C.**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
205-314-0500